**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| RAIL SCALE, INC., a Florida corporation,<br><br>Plaintiff,<br><br>v.<br><br>WINGFIELD SCALE COMPANY, INC., a Tennessee corporation,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:21-cv-287-TAV-CHS<br><br>**JURY DEMAND** |

**WINGFIELD'S MOTION FOR SUMMARY JUDGMENT ON INVALIDITY AND FOR PARTIAL SUMMARY JUDGMENT ON NON-INFRINGEMENT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................ 1

STATEMENT OF UNDISPUTED FACTS ............................................................ 3

A. The Railroad Scale Calibration Industry ............................................................ 3

B. The ’100 Patent ............................................................ 3

C. The Prior Art Systems ............................................................ 6

1. The RSI-Palfinger Equipment ............................................................ 6

2. The RSI-Mynatt Equipment ............................................................ 9

3. Commercial and Public Use of the RSI-Palfinger and RSI-Mynatt Equipment ........... 11

4. The BRC Equipment ............................................................ 12

D. RSI’s Unsupported Spreader Bar Testimony ............................................................ 13

E. The Wingfield Equipment ............................................................ 15

ARGUMENT ............................................................ 17

A. The ’100 Patent Is Invalid In View Of RSI’s Own Equipment ............................................................ 18

1. RSI’s Own Equipment is Prior Art That Predates the Critical Date ............................................................ 20

a. The RSI Equipment Was Ready for Patenting Prior to the Critical Date ................ 20

b. The RSI Equipment Was In Commercial, Public Use Prior to the Critical Date ..... 20

2. The RSI-Palfinger Equipment Anticipates Claims 1-5, 7-9, and 17 of the ’100 Patent Under 35 U.S.C. §102. ............................................................ 21

3. Claims 10-16 are Anticipated by the *RSI-Palfinger Equipment* Alone ........................ 27

4. Claims 1-5 and 7-16 are Anticipated by the *RSI-Mynatt Equipment* ........................... 31

5. Claims 6, 11, and 15 are invalid as being obvious over the *RSI-Palfinger Equipment* alone or in combination with the *RSI-Mynatt Equipment* ............................................................ 32

B. The Asserted Claims Are Invalid As Anticipated And/Or Obvious Over The BRC Equipment Alone Or In Combination With The RSI-Palfinger Equipment And The RSI-Mynatt Equipment ............................................................ 34

1. The *BRC Equipment* is Prior Art under 35 U.S.C. §102 ............................................................ 34

2. All Elements of the Claims 1-4, 7, 8, and 10-17 are anticipated over the *BRC Equipment* ............................................................ 34

3. Claims 5, 6, 9 are invalid for being obvious over the *BRC Equipment* ........................ 36

C. The Wingfield Equipment Does Not Infringe Any Claim Of The ’100 Patent When Wingfield Uses Straps Instead Of A Spreader Bar To Lift Its Weight Cart ............................ 37

1. When the Wingfield Equipment uses a pair of straps to lift its weight cart, it does not perform every step of Claim 10 ............................................................................ 39

2. When the Wingfield Equipment uses a pair of straps to lift its weight cart, it does not include every element of Claim 1. ........................................................................... 40

3. When the Wingfield Equipment uses a pair of straps to lift its weight cart, it does not include every element of Claim 7. ........................................................................... 40

4. When the Wingfield Equipment uses a pair of straps to lift its weight cart, it does not include every element of dependent Claims 2-6, 8, 9, and 11-17. ....................................... 41

CONCLUSION ........................................................................................................ 41

APPENDIX A: EXHIBITS ........................................................................................ 43

APPENDIX B: ’100 PATENT CLAIMS .................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792 (Fed. Cir. 1990) ................................ 37

*Bruederle v. Louisville Metro Gov't*, 687 F.3d 771 (6th Cir. 2012) ............................................ 17

*Conoco, Inc.v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349 (Fed. Cir. 2006 ................................ 38

*Continental Can Co. v. Monsanto Co.,* 948 F.2d 1264 (Fed. Cir. 1999) ................................ 18, 27

*Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303 (Fed. Cir. 2011) .......................... 37

*Eastman Chem. Co. v. BASF Aktiengesellschaft,* No. 2:97-CV-450, 2000 WL 1897258 (E.D. Tenn. Oct. 31, 2000) ............................................................................................................ 37

*Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955 (Fed. Cir. 2001) ............................................ 18

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002) ............................ 38

*Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339 (Fed. Cir. 2000) .................................................... 18

*Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, 586 U.S. 123 (2019) ............................ 19, 20

*Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356 (Fed. Cir. 2017) ................. 1

*KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) ................................................................. 32

*Malibu Boats, LLC v. Skier's Choice, Inc.*, 534 F.Supp.3d 888 (E.D. Tenn. 2021) ............... 18, 23

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed. Cir. 1995) ...................................... 37

*Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992) ............................................................. 18

*Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352 (Fed. Cir. 2007) ..................................... 41

*Pharma Tech Solns. v. Lifescan, Inc.*, 942 F.3d 1372 (Fed. Cir. 2019) ....................................... 38

*Polara Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339 (Fed. Cir. 2018) .......................................... 19

*Quest Integrity USA, LLC v. Cokebusters USA Inc.,* 924 F.3d 1220 (Fed. Cir. 2019) ........... 18, 19

*Rail Scale, Inc. v. Balanced Railscale Certification, LLC, et al.*, Case No. 2:15-CV-02117 (E.D. Tex., Dec. 30, 2015) ........ 13

*Tesco Corp. v. Weatherford Intern., Inc.*, 904 F.Supp.2d 622 (S.D. Tex. Oct. 19, 2012) ........ 18

*V-Formation, Inc. v. Benetton Grp. SpA,* 401 F.3d 1307 (Fed. Cir. 2005) ........ 37

*Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546 (Fed. Cir. 1989) ........ 41

**Statutes**

35 U.S.C. § 102(a)(1) ........ 19

35 U.S.C. § 102(b)(1) ........ 19

35 U.S.C. § 103 ........ 19

**Rules**

Fed. R. Civ. P. 56(a) ........ 17



Case 1:21-cv-00287-TAV-CHS Document 150 Filed 04/11/25 Page 5 of 46 PageID #: 8522

## INTRODUCTION

A patentee cannot "sell his invention publicly" and later "take out a patent" on it. *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1369 (Fed. Cir. 2017). Despite this, plaintiff Rail Scale, Inc. ("RSI") asserts a patent covering the same systems and methods that it publicly sold and used nearly a decade before filing for patent protection—rendering the patent in this case invalid as a matter of law.

In a promotional video dated before 2011, plaintiff Rail Scale, Inc. boasted to its customers that its non-railbound scale calibration test process was "approaching tried and true status" and was "successfully applied on thousands of railroad scales throughout the U.S." Myers Dep. at 82:6-86:14, 86:19-87:13, 88:10-20 & Ex. 12, excerpts attached as Exhibit A.[1] Nearly a decade later, RSI filed a patent application that resulted in U.S. Patent No. 10,996,100 ("the '100 Patent"), claiming its "spreader bar" as its alleged point of novelty. In doing so, RSI failed to inform the Patent Office of its prior commercial exploitations of the very same claimed equipment and methods sought for protection in the patent, including the alleged "spreader bar." This was improper, not merely for RSI's failure to abide by its duty of candor to the Patent Office (which is not at issue in this motion), but because RSI's prior commercial sales and public use render the '100 Patent invalid as a matter of law.[2]

In addition to RSI's commercial use, other non-rail bound prior art systems invalidate the '100 Patent. RSI has admitted that one such system was publicly sold and used by Balanced

---

[1] A listing of the exhibits to this motion is attached as Appendix A.

[2] The "presumption of validity" does not protect a patentee's negligence or willful blindness to the patent process. RSI was obligated by law to provide information about all known "prior art" to the Patent Office, which it wholly failed to do. 37 C.F.R. § 1.56 (describing duty of candor). Had RSI fulfilled that obligation, as outlined herein, the '100 Patent would not have been allowed in the first instance.

Railway Certification, LLC ("BRC") at least four years prior to Rail Scale's patent application.[3] Indeed, BRC—founded by prior Rail Scale employees—provided a nearly identical system to Rail Scale's system that calibrated scales for customers using the same equipment and in the same way as the '100 Patent claims (the "*BRC Equipment*").

While RSI may assert that its prior equipment (and the *BRC Equipment*) did not disclose or use a "spreader bar" having "extension bars" or "coupling bars" capable of locking in both retracted and extended positions, as required by the '100 Patent's claims, this position is unsubstantiated. Conclusory assertions, especially where contradicted by overwhelming undisputed record evidence, are insufficient to preclude summary judgment. Wingfield is entitled as a matter of law to a finding of invalidity as to every asserted claim of the '100 Patent.

Wingfield also is entitled to partial summary judgment of non-infringement relating to its use of nylon straps instead of a "spreader bar" as required by the '100 Patent claims. Since Wingfield began providing railroad scale calibration services, it utilized two versions of its equipment. The first version, used primarily before 2021, used a spreader bar to lift the weight cart onto and off a trailer. In a subsequent, and more prevalently (and currently) used version, Wingfield used a pair of nylon straps to lift the weight cart onto and off the trailer. This second version indisputably does not infringe any claim of the '100 Patent because it does not use a "spreader bar." On this point, Rail Scale's own expert agrees, and there is no evidence that supports any other finding. Wingfield is thus also entitled to a declaratory finding of partial non-infringement relating to use of its systems where a weight cart is lifted on/off using nylon straps.

[3] In 2015, Rail Scale filed a lawsuit alleging that BRC had copied and used its non-railbound system. In that suit, which was later dismissed with prejudice by Rail Scale, Rail Scale admitted that BRC's public use included all components of Rail Scale's prior art systems.

## STATEMENT OF UNDISPUTED FACTS

### *A. The Railroad Scale Calibration Industry*

Railroad scales weigh railroad carts. '100 Patent at col. 1, attached as Exhibit E. Precise weight values are important, and railroad scales require routine calibration. *See id.* Historically, weight carts traveling by rail ("railbound") were used to test railroad scales to determine whether they needed to be calibrated. *See id.*; Smith Decl. at ¶ 5, attached as Exhibit B. In the 1990s, a company called Tiffin Loader Crane began designing and building railroad scale test equipment for its customers that generally included a weight cart pre-loaded with a desired test weight that could be transported over the road rather than the rails. Exhibit B at ¶¶ 6-8; Kelly Dep. at 13:6-14, 35:10-17, 38:9-18, 35:1-7, 81:2-24 & Ex. 9, excerpts attached as Exhibit C. At that time, the weight carts could be transported in one of three ways: using a trailer, flatbed, or enclosed truck. Exhibit C 34:8-35:7; Exhibit B at ¶ 6. Tiffin Loader Crane was later acquired by Palfinger USA (collectively with Tiffin Loader Crane, "Palfinger"). *See id.* In or around 1999, working with Jack Payne, then the President of RSI, an engineer at Palfinger designed a two-trailer system for testing railroad scales, which allowed the transportation of more weights than had previously been transported using single-truck over-the-road testing systems, otherwise known as "non-railbound" equipment. Exhibit B at ¶ 10. Since this time, Palfinger, Rail Scale, and others have publicly utilized two-trailer, non-railbound equipment to transport calibration equipment to/from locations for railroad scale calibrations of paying customers.

### *B. The '100 Patent*

On February 5, 2019, nearly two decades after Palfinger designed the two-trailer system for testing railroad scales, RSI filed a patent application claiming a non-railbound, two-truck system for calibrating railroad scales, which was granted as the '100 Patent. *See* Exhibit E. Notably, however, Rail Scale failed to inform the Patent Office of Palfinger's design in the late

1990s or Rail Scale's (or other's) commercial uses of non-railbound, two-truck systems over the decade prior to filing its patent application.

The '100 Patent includes seventeen claims—nine apparatus claims covering non-railbound railroad scale calibration equipment, and eight method claims covering a method for transporting, loading, and unloading that equipment. *Id.*; Expert Report of Roelof deVries Regarding Invalidity of U.S. Patent No. 10,996,100 ("deVries Invalidity Report") ¶ 28, attached as Exhibit D. FIG. 1 of the '100 Patent, excerpted below, illustrates the equipment claimed in the '100 Patent.



FIG. 1

Generally stated, the '100 Patent claims a calibration vehicle (also known as a "weight cart"), weights, and weight bins. Exhibit D at ¶ 28; Exhibit E at 8:45-11:8. The '100 Patent also claims several components that are conventionally used in transporting and unloading/loading heavy machinery, such as trailers, cranes, and spreader bars, used to load/unload the weights and calibration vehicle. Exhibit D at ¶ 29.

RSI's spreader bar is disclosed in Figure 4 of the '100 Patent:




FIG. 4

Consistent with this figure, the parties agreed during claim construction that the term "spreader bar" means a "beam with two internal coupling bars, hooks, locking pins, and a connector for coupling to a crane." Dkt. 102 at 4. The parties also agreed that a "coupling bar" or "extension bar" of a spreader bar is "a bar that can be extended or retracted from the spreader bar and be locked in either position. *Id.* Generally, the purpose or function of a spreader bar is to distribute or spread a load. *See* Expert Report of Roelof deVries Regarding Wingfield's Non-Infringement of U.S. Patent No. 10,996,100 ("deVries Non-Infringement Report") at ¶ 62, attached as Exhibit F.

During prosecution of the '100 Patent, RSI sought to distinguish references cited by the USPTO examiner by arguing that there is "no mention [in the prior art] that a spreader bar is used to move/lift the weight moving vehicle" and narrowed independent claims 1, 7, and 10 in support of this position. *Id.* at ¶¶ 27-40. Accepting this assertion, the USPTO examiner allowed the application. *Id.* As such, RSI claimed novelty in its patent based on using the spreader bar to lift both the calibration vehicle and the weights—things that had been done by both Rail Scale and others for years prior to the patent application's filing.

### *C. The Prior Art Systems*

1. **The RSI-Palfinger Equipment**

RSI's first two-trailer system was designed by Palfinger in 1999 (the "*RSI-Palfinger Equipment*") and was built on many standard components used by Palfinger for other customers over the years. Exhibit B at ¶ 11, 13 & Ex. B;[4] Exhibit C at 78:7-79:23; *see also* BRC Good Dep. at 28:7-9 [redacted], excerpts attached as Exhibit J. The layout of the *Rail Scale-Palfinger Equipment* is exemplified below:







*See* Exhibit D at ¶ 46. The *RSI-Palfinger Equipment* includes two tractors, and each tractor had a trailer attached to it. Exhibit B at ¶ 12 & Exs. C, D; *see also* Exhibit D at ¶ 46; Second Buchhorn Dep. at 160:12-15, excerpts attached as Exhibit I. One trailer carried a weight bin, a weight cart,

---

[4] For a time, the design drawings for *RSI-Palfinger Equipment* showed "Tiffin Palfinger" in the title block, which was a combination of Tiffin Loader Crane and Palfinger. Exhibit C at 13:20-23.

and a crane positioned in that order from front to back on the trailer. Exhibit B at ¶ 12 & Exs. C, D; *see also* Exhibit D at ¶ 46; Buchhorn Rpt. at Ex. C-3, attached as Exhibit K; Exhibit I at 16:1-23, 21:19-24:22. The other trailer carried another weight bin. *Id.* The weight cart on the *RSI-Palfinger Equipment* included a container for holding weights, four railroad track wheels, an engine, and controls. *Id.* The weight cart also stored a spreader bar in receivers in the side walls of the weight cart. *Id.*; Exhibit D at ¶¶ 47-48. The receivers were located on each of the side walls of the rail cart to minimize any unintended rotation of the weight cart about the spreader bar when the weight cart was lifted on and off of the trailer using the crane and spreader bar. *Id.* When in transport, the weight cart was stored on a cart stand on the floor of the trailer that had several posts for securing the cart to the trailer. *Id.*; Exhibit D at ¶¶ 74-75.

The *RSI-Palfinger Equipment*'s spreader bar was based off the standard Palfinger spreader bar and was designed as shown below. Exhibit C at 86:20-21, 88:15-89:25 & Ex. 6 (PalfingerSub 11); Exhibit B ¶ 19.




As shown, the spreader bar included four hooks for engaging with grip handles of four test weights to lift the weights. Exhibit B at ¶ 20; Exhibit D at ¶ 80; Exhibit I at 139:1-22. The spreader bar

also included a connector for connecting the spreader bar to the knuckle-boom crane. Exhibit B at ¶ 20; Exhibit D at ¶ 81; Exhibit I at 139:1-22. Like the spreader bar claimed in the '100 Patent, the spreader bar on the *RSI-Palfinger Equipment* also had extension bars on either side for sliding each extension bar into either an extended or retracted position. Exhibit B at ¶¶ 20-21 & Ex. F; Exhibit D at ¶¶ 82-84. Spring-loaded pins (designated as items C in the figure) locked the sleeve extensions into place in both the retracted and extended positions by fitting into holes in the extension sleeves. Exhibit C at 91:9-20; Exhibit D at ¶ 85; Exhibit B ¶¶ 20-21 & Ex. F.

Thus, the design incorporated two holes, as was standard on Palfinger's spreader bar, one to lock the spreader bar in the extended position, and one to lock the spreader bar in the retracted position. Exhibit C at 94:21-97:8 & Ex. 6 (Palfinger Sub 118); 97:9-100 & Ex. 6 (Palfinger Sub 110); *see also* TECHcetera Dep. at 91:12-92:1 [redacted], excerpts attached as Exhibit G; Exhibit I at 125:19-126:3; 143:15-25. The purpose of the extension bars was to "retract in and out so you are able to both pick up the cart by extending them out. And then when you need to set the weights in, you will retract them so that the weight bar can still go down inside of the cart without hitting the walls." Exhibit C at 90:5-91:8. Further "[the spreader bar] will lock in the retracted and extended position. It is a safety feature." *Id.* at 91:19-91:19-93:5.




*See* Exhibit C at Ex. 6 (PalfingerSub 104-105).[5]

After the units designed by Palfinger were complete, representatives of Palfinger and RSI publicly tested the unloading and unloading of the unit and the use of the testing cart on the scale at the Bascom Elevator spur rails near Tiffin, Ohio. Exhibit C at 56:20-59:17, 102:5-103:1; Exhibit B at ¶¶ 23-35. Photos of that public use and display of the *RSI-Palfinger Equipment* were taken documenting the test. Exhibit C at 124:11-125:24 & Ex. 14. During that public use, the spreader bar was operated in both the extended and retracted positions – "fully extended to lift the cart and set it onto the rails, and then we would have had to retract those extensions to be able to load the test weights." Exhibit C at 101:6-15; Exhibit B at ¶¶ 27, 28, 33.

2. **The RSI-Mynatt Equipment**

[redacted] ("*RSI-Mynatt Equipment*"). Exhibit G at 24:20-25, 29:15-20, 66:22-67:3. [redacted] *Id.*

---

[redacted] Exhibit A at Ex. 13. [redacted] *See* Exhibit C at 54:19-24.

at 30:11-19. [redacted] *Id.* at 31:15-19. [redacted] *Id.* at 33:10-13.[6]

Over time, [redacted] *Id.* at Ex. 10, Ex. 14;[7] Mynatt Dep. at 78:13-23, excerpts attached as Exhibit H; Exhibit A at 109:5-110:18. [redacted] Exhibit G at 101:25-104:7 & Ex. 10; Exhibit H at 79:16-22, 89:16-90:13, 93:7-20; Exhibit D at ¶¶ 53-56.

[redacted]

[redacted]

---

6 [redacted] Exhibit A at Ex. 13.

7 Documents produced by TECHcetera bearing bates numbers TECH-000001 - TECH-132827 were kept in the ordinary course of TECHcetera's business and are true and accurate copies of the documents stored in those files. Exhibit G at 73:4-12. Documents produced by Mynatt bearing bates numbers MYNATT-000001 – MYNATT-002087 were kept in the ordinary course of Mynatt's business and are true and accurate copies of the documents stored in those files. Exhibit H at 65:13-66:6.

Exhibit G at 123:4-128:4; Exhibit H at 80:8-19, 89:16-90:13, 118:25-121:24 & Ex. 8; Exhibit D at ¶¶ 53-56.

[redacted]

[redacted] Exhibit G at 105:3-9, 127:24-128:4; Exhibit H at 89:16-90:13 & Ex. 6; Exhibit I at 125:19-126:9. [redacted] Exhibit G at 127:18-23; Exhibit H at 89:16-90:13, 93:5-20, 118:7-121:24, & Exs. 6, 8; Exhibit I at 125:19-126:9. [redacted] Exhibit G at 128:22-131:13 & Ex. 15; Exhibit D at ¶¶ 212-218.

3. **Commercial and Public Use of the RSI-Palfinger and RSI-Mynatt Equipment**

RSI does not deny that it used the *RSI-Palfinger Equipment* and *RSI-Mynatt Equipment*, including the spreader bars, in the field with customers. [redacted] *See, e.g.*, Scarfo Dep. at 83:21-87:18 & Ex. 11, excerpts attached as Exhibit L; Exhibit M (composite testing certifications); Exhibit N [redacted]

[redacted] Exhibit O [redacted] . [redacted] Exhibit A at Exs. 10, 11, and 12; Exhibit L at 66:3-70:10 & Exs., 7, 8. [redacted] *See, e.g.*, Exhibit P (RSI003808-3810 (calibration report for weight cart Ser. No. 206600 designed by Tiffin Palfinger); RSI3965-3967 (calibration report for Weight Cart Serial No. 210500); RSI004015-4017 (calibration report for Weight Cart Serial No. 210501 designed by TECHcetera). During discovery, RSI produced 13,873 pages of these test and inspection reports utilizing its inventory of test carts between 2008 and 2017, which included hundreds of reports utilizing both the *RSI-Mynatt Equipment* and *RSI-Palfinger Equipment*. By way of example, Wingfield created an exhibit showing the five earliest reports for each relevant weight cart of the *RSI-Palfinger Equipment* (Cart Nos. WC204500, WC206600, WC208700, and WC11738) and *RSI-Mynatt Equipment* (Cart Nos. WC210500 and WC210501). Exhibit M.

4. **The BRC Equipment**

In or around February 2015, two former RSI employees formed a company called Balanced Railway Certification ("BRC"). Sandifer Decl. at ¶ 2, attached as Exhibit Q. They designed and built a two-truck system for calibrating railroad scales, which was completed around October 2015. *Id.* ¶ 6, 7; *see also* Exhibit D at ¶¶ 58-60. The *BRC Equipment* was in open and public use on customer sites at least as early as January 2016. Exhibit Q at ¶ 8; Sandifer Dep. at 132:1-136:6 & Ex. 6, excerpts attached as Exhibit R.

As depicted in a sales brochure from that time, and as described by Mr. Sandifer, the structure and operation of the *BRC Equipment* was substantially the same as the Rail Scale

equipment, thus likewise invalidating the '100 Patent.[8] Exhibit Q at ¶¶ 11-15 & Ex. 1. The BRC weight cart and certified weights were certified at a collective weight of 80,000 pounds by the Minnesota Department of Weights and Measures. Exhibit R at 78:9-79:13 & Ex. 4. BRC built its lifting (spreader) bar, which is "a common thing used in the industry. . .it's a lifting device to pick up heavy items." Sandifer BRC Dep. at 105:18-19; 126:17-21, excerpts attached as Exhibit S. When the *BRC Equipment* was being used to lift the weights, it would be locked in the retracted position. *See* Sandifer Dep. at 19:5-13; 22:16-19, excerpts attached as Exhibit R; Exhibit D at ¶ 60; Exhibit I at 184:14-185:14 [redacted]

### *D. RSI's Unsupported Spreader Bar Testimony*

Testifying as the RSI corporate representative, [redacted] *See* Exhibit A at 21:19-25, 70:12-73:71, 70:1-178:1; 127:8-128:1, 129:22-131:23, 134:9-141:15 & Ex. 18 [redacted] *see also* WT Good Dep. at 286:19-

[8] RSI has admitted through a lawsuit filed in 2015 (later dismissed with prejudice by RSI) that BRC's system was nearly identical to RSI's and that it was used publicly at least four years prior to Rail Scale's patent filing. *See* Pl.'s Original Compl. and Application for Prelim. and Permanent Inj. at ¶ 31, *Rail Scale, Inc. v. Balanced Railscale Certification, LLC, et al.*, Case No. 2:15-CV-02117 (E.D. Tex., Dec. 30, 2015), ECF No. 1. Indeed, in that November 2015 filing, Rail Scale alleged that BRC "advertised ***identical*** services in the states where Rail Scale operates[]" and that BRC's system were "a ***direct copy*** of the weight carts used by Rail Scale." *Id.* at ¶¶ 33, 41-42, 110 (emphasis added). [redacted] BRC Good Dep. at 109:22-112:24, excerpts attached as Exhibit J.

293:3, excerpts attached as Exhibit T. [redacted] *See* Exhibit A at Ex. 30 ¶¶ 18-20 (Myers Declaration). Voluminous witness testimony confirms that the *RSI-Palfinger Equipment* and *RSI-Mynatt Equipment* were capable of locking in a retracted position. Exhibit B at ¶20-22; Exhibit C at 91:2-93:5; Exhibit I at 143:15-25, 147:5-24; Exhibit G at 101:25-104:7 & Ex. 10; Exhibit H at 79:16-22, 89:16-90:13, 93:7-20. [redacted] Exhibit L at 17:6-11 19:6-21:7, 30:14-18, 53:11-14 [redacted]; Exhibit A at 33:22-25 [redacted]; *see also* Widgeon Dep. at 74:1-6, excerpts attached as Exhibit U (describing witnessing RSI performing its railroad scale testing method in the same manner for decades); Exhibit R at 126:20-127:1 (the steps he performed when using the RSI Equipment when drove for a RSI team from 2003 to 2011 were the same as those performed by BRC with its equipment). [redacted] Exhibit L at 89:2-11; *see* Ex. 9 (customer certifications). [redacted] Exhibit L at 89:15-23;[9] *see also* Exhibit U at 89:3-90:16 (a Wingfield employee who was onsite with RSI while it performed

[9] Mr. Scarfo posted true and correct copies of photos of the equipment he operated for RSI on Facebook in August 2015 and November 2015. Exhibit L at 66:3-70:10 & Exs. 7, 8. [redacted] *Id.* at 88:7-19.

railroad scale testing as early as 2009 could not recall a time when it looked like the spreader bar was not locked in the retracted position, which would have been a "big no-no"). [redacted] Exhibit H at 160:21-162:16 & Ex. 18; 167:3-169:4 & Ex. 20.

[redacted] his conclusory declaration should not be credited. Exhibit A at 23:17-21, 24:4-13, 39:22-41:9 [redacted] *Id.* at. [redacted] *Id.* at 143:4-25, 184:22-185:7; 122:4-7 [redacted] *Id.* at 77:13-17.

***E. The Wingfield Equipment***

Wingfield Scale Company, Inc. ("Wingfield") is a Chattanooga-based family owned and operated business that has been servicing scales in a variety of industries since 1937. Its President, Joseph Wingfield, is the grandson of the company's founder. Wingfield Dep. at 11:15-17, 12:14-14:12, excerpts attached as Exhibit V. Wingfield has calibrated railroad scales for many years in a variety of different ways.

In 2019, Wingfield developed its own system that would allow it to do railroad scale testing with its own test cart and equipment. *Id.* at 16:11-17:21. Wingfield's service manager, who has been with the company for 38 years (Davis Dep. at 7:18-23, excerpts attached as Exhibit W), explained that Wingfield identified a need in the market for additional scale testing services based on discussion with their customers, who were asking for solutions to help eliminate the wait time they experienced for scale calibrations, including as customers of RSI. Exhibit W at 17:13-18:1; *see also id.* at 124:18-127:23 (describing specific customers' frustration with the timeliness of RSI's service and the effect on their business). "The whole reason we got into this business is because we'd been doing it at the time for over 80 years and we take care of all our customers' scales." Exhibit V at 177:24-178:2.

Wingfield's equipment is not used solely to perform railroad scale calibrations but is instead multi-purpose equipment. Exhibit W at 39:2-16. Wingfield therefore "put a lot of thought into" custom designing its equipment with unique features for its multi-purpose use. Exhibit V at 46:8-11, 52:9-14, 167:3-168:15, 192:5-17. For example, it went through "many [design] iterations" to develop unique to the industry 3,000 pound test weights to "minimize the number of lifts and moves from our system." *Id.* at 46:22-47:18.

Jeremy Godfrey, lead railroad scale service technicians, is the primary technician who has operated Wingfield's equipment. Exhibit W at 54:1-55:1; Exhibit V at 78:3-14; Godfrey Dep. at 13:17-20, 40:4-20, excerpts attached as Exhibit X; Notice of Filing Godfrey Decl. [Doc. 130], Ex. A ¶¶ 2-3.

In or around December 2021, Wingfield began using nylon straps, rather than the metal bar, to lift its weight cart onto and off of the railroad tracks. Godfrey Decl. ¶¶ 12-17; Exhibit W at 133:23-134:11; *see also* Exhibit U at 39:24-40:4; 41:1-10 (describing having personally witnessed

888, 901-2 (E.D. Tenn. 2021) (citing *Mitchell v. Toledo Hosp*., 964 F.2d 577, 584 (6th Cir. 1992)). Courts may grant summary judgment where the alleged infringer has presented "such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Tesco Corp. v. Weatherford Intern., Inc.*, 904 F.Supp.2d 622, 627 (S.D. Tex. Oct. 19, 2012) (citing *Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001)).

No dispute of material fact exists regarding the invalidity of the '100 Patent in view of the *RSI-Palfinger Equipment*, the *RSI-Mynatt Equipment*, and the *BRC Equipment.* Wingfield is entitled to summary judgment that the '100 Patent is invalid. Further, no dispute of material fact exists that when Wingfield uses a pair of straps to lift its weight cart (which is not a "spreader bar" as required by the claims), Wingfield does not infringe any claim of the '100 Patent.

***A. The '100 Patent Is Invalid In View Of RSI's Own Equipment***

A system or method in existence before a patent was filed anticipates (and thus invalidates) the patent's claims under 35 U.S.C. § 102 if it contains every limitation of the claimed invention. *See, e.g.*, *Quest Integrity USA, LLC v. Cokebusters USA Inc.,* 924 F.3d 1220, 1227 (Fed. Cir. 2019). Anticipation is a two-step analysis. *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000). The first step, claim construction, is a question of law that this Court has already performed (Dkt. 102). *Id.* The second step compares the construed claims to the prior system or method to determine if every claim limitation present in the prior system or method. *Id*. A claim limitation is present in the prior art system or method if it is expressly or inherently disclosed. Inherency is shown where an element is "necessarily present" or in the "natural result flowing from the operation as taught." *See Continental Can Co. v. Monsanto Co.,* 948 F.2d 1264, 1269 (Fed. Cir. 1999) ("If [] the disclosure is sufficient to show that the ***natural result flowing from the operation***

***as taught*** would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient.").

Under 35 U.S.C. § 102(a)(1), a person is not entitled to a patent when "the claimed invention was patented, described in a printed publication or ***in public use, on sale, or otherwise available to the public*** before the effective filing date of the claimed invention." An invention is considered "on sale" where the product or process is "subject of a commercial offer for sale" and "ready for patenting." *Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, 586 U.S. 123, 125 (2019). A similar standard applies to prior public uses of the invention. *See Polara Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339, 1348 (Fed. Cir. 2018). To anticipate, and thus invalidate, a patent claim under §102(a)(1)'s "on sale bar," there must be a "commercial offer" and "the invention that was the subject matter of the offer for sale must satisfy each claim limitation of the patent though it may do so inherently." *Quest Integrity,* 924 F.3d at 1227. This "on-sale bar" seeks to prevent "any attempt to use the claimed invention for profit, and not by way of experiment, for more than one year before filing for a patent application." *Id.* Under 35 U.S.C. § 102(b)(1), if a prior sale of the claimed invention was made by an inventor, or by another who obtained the subject matter of the invention from an inventor, then to be invalidating such a sale must occur more than one year before the filing date of the patent (the "critical date").

Under 35 U.S.C. § 103, that which does not anticipate the claimed invention under 35 U.S.C. §102, can still render it obvious and therefore invalid if "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." While both parties in this case have proposed a level of skill for a person of ordinary skill in the art ("POSITA") of the '100 Patent, neither party

contends that its legal positions depend on its proposed level of skill or would change using the other party's proposal.

All claims of the '100 Patent are anticipated and/or obvious over RSI's own equipment, as exemplified by the *RSI-Palfinger Equipment* and the *RSI-Mynatt Equipment*, which was both ready for patenting and on sale or otherwise in public use more than a year before the February 5, 2019 filing date.

### 1. RSI's Own Equipment is Prior Art That Predates the Critical Date

#### a. The RSI Equipment Was Ready for Patenting Prior to the Critical Date

The *RSI-Palfinger Equipment* and *RSI-Mynatt Equipment* were both "ready for patenting" before the critical date because they were both the subject of detailed technical drawings specific enough to enable a POSITA to practice the invention and reduced to practice well before the critical date. *See Helsinn*, 586 U.S. at 130 (explaining evidence that an invention is ready for patenting includes proof of "reduction to practice" or "drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." [redacted] *See* Exhibit C at 75:23-77:4 & Ex. 6; Exhibit B at ¶¶ 14, 15 & Ex. C, D; Exhibit H at 36:9-23; Exhibit G at 49:8-50:6, Ex. 10 & 14; Exhibit D at ¶49, 56. [redacted] Exhibit A at 92:4-101:2, 96:13-24, & Ex. 13; Exhibit T at 286:19-293:3; *see* Section I.B *infra* below. There can be no credible dispute that the *RSI-Palfinger Equipment* and *RSI-Mynatt Equipment* was not ready for patenting before the critical date.

#### b. The RSI Equipment Was In Commercial, Public Use Prior to the Critical Date

RSI cannot credibly dispute that it used the *RSI-Palfinger Equipment* and the *RSI-Mynatt Equipment* to perform railroad scale calibrations for paying customers before the critical date [redacted] *See, e.g.*, Exhibit A at Exs. 10, 11, and 12; Exhibit L at 66:3-70:10 & Exs., 7, 8. [redacted] (Exhibit L at 21:6-11) [redacted]s (Exhibit M), [redacted] (Exhibit L at 44:11-23; Exhibits N & O). [redacted]*ee* Exhibit B at ¶ 13 & Ex. B and Exhibit C at 48:2-14; Exhibit A at Ex. 13[redacted]*ee* Exhibit M at 1[redacted] *See* Exhibit L at Ex. 11 (RSI165404); Exhibit H at 176:24-177:11. Each of these examples qualifies as a prior-art sale and use of the *RSI-Palfinger* and *RSI-Mynatt Equipment* respectively. Numerous other examples exist [redacted] Exhibit A at 169:14-178:1.

2. **The RSI-Palfinger Equipment Anticipates Claims 1-5, 7-9, and 17 of the '100 Patent Under 35 U.S.C. §102.**

The prior-art *RSI-Palfinger Equipment* includes every claim limitation, and thus anticipates, the apparatus claims 1-5, 7-9, and 17 in the '100 Patent under this Court's claim

constructions. *See* Exhibit D at ¶¶ 69-200; Dkt. 102. Appendix B identifies and copies each of the claim elements discussed below (e.g., "Element 1.x").

**i.** Preamble of Claim 1: It is undisputed that all limitations in the preamble of claim 1 are present in the *RSI-Palfinger Equipment*. Exhibit D at ¶¶ 70-71; *see also* Exhibit K at Ex. C-3; Exhibit I at 16:1-23, 21:19-24:22; *see also* Exhibit B at ¶12.

Element 1.1 of Claim 1: It is undisputed that the *RSI-Palfinger Equipment* (i) discloses a calibration vehicle (or weight cart) that is coupled to a middle section of the first trailer; and (ii) the calibration vehicle includes a platform, railroad rack wheels attached to the bottom of the platform, an engine which controls the propulsion of the calibration vehicle along the railroad track rails, a first wall and a second wall forming a container on top of the platform, the first wall including a receiver and the second wall including a receiver. Exhibit D at ¶¶ 72-79; *see also* Exhibit B at ¶¶ 12, 16; [redacted] Claim 1.1 further recites a spreader bar, which was also contained in the *Rail Scale-Palfinger Equipment* as shown below.

| ***'100 Patent at Fig. 4*** | ***Rail Scale-Palfinger*** |
|---|---|
|   FIG. 4 |   |

[redacted] the *RSI-Palfinger Equipment* includes a spreader bar for coupling to the crane where the spreader bar is a beam with two internal coupling bars, four hooks, two locking pins, and a connector, as construed by the Court. Exhibit D at ¶¶ 81-9[redacted]

[redacted] the *RSI-Palfinger Equipment* was capable of locking in both extended and retracted positions, consistent with the Court's constructions for "coupling bars"/"extension bars." Exhibit D at ¶¶ 86-92; [redacted] Dkt. 102. [redacted]

[redacted]

Exhibit I at 143:15-25; *see also* Exhibit B at ¶ 20, 21; *see also* Exhibit C at 91:2-93:5 ("Q. Would it be contrary to the intended use of the spreader bar to not lock this when its in the retracted position …Yes. It would not be advised to operate the spreader bar without the safety pins engaged. Q. In either the extended or retracted position. A. Yes.").

Any conclusory and unsupported assertions otherwise are insufficient to overcome the weight of evidence in the record. *Malibu Boats*, 534 F. Supp. 888 at 900 ("A mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment….") Moreover, testimony of Rail Scale's own employees familiar with the prior art systems refutes Rail Scale's unsupported assertions. For example, [redacted] *See* Exhibit L at 89:2-89:23. Evidence from Palfinger likewise demonstrates that its core spreader bar design provided to RSI in 2007 included this feature. Exhibit C at 91:2-93:5; Exhibit B at ¶¶ 19, 21. [redacted]

[redacted] Exhibit G at 163:14-167:4 & Ex. 30; Exhibit H at 224:21-231:11 & Ex. 40.

**ii.** Element 1.2 of Claim 1: It is undisputed that the *RSI-Palfinger Equipment* discloses the spreader bar attached to and stored in the first receiver and the second receiver. Exhibit D at ¶ 97; [redacted] *see also* Exhibit B at ¶ 12.

**iii.** Element 1.3 of Claim 1: It is undisputed that the *RSI-Palfinger Equipment* includes a first bin coupled to a front section of the first trailer and configured to hold first weights. Exhibit D at ¶¶ 98-99; [redacted] *see also* Exhibit B at ¶ 17.

**iv.** Element 1.4 of Claim 1: It is undisputed that the *RSI-Palfinger Equipment* discloses the first weights having grip handles stored in the first bin. Exhibit D at ¶ 100; Exhibit K at Ex. C-3 [redacted] *see also* Exhibit B at ¶ 17.

**v.** Element 1.5 of Claim 1: It is undisputed that the *RSI-Palfinger Equipment* includes a second bin coupled to the second trailer and configured to hold second weights. Exhibit D at ¶¶ 101-102; [redacted] *see also* Exhibit B at ¶ 18.

**vi.** Element 1.6 of Claim 1: It is undisputed that the *RSI-Palfinger Equipment* discloses the second weights having grip handles stored in the second bin. Exhibit D at ¶ 103; Exhibit K at Ex. C-3 [redacted] *see also* Exhibit B at ¶ 18.

**vii.** Element 1.7 of Claim 1: It is undisputed that the *RSI-Palfinger Equipment* includes a crane mounted to a back section of the first trailer where the crane is both capable of (i) positioning the calibration vehicle from the middle section onto the railroad track rails to engage the railroad track wheels with the railroad track rail and (ii) transferring one or more of the first weights from the first bin to the container of the calibration vehicle or the second weights from the second bin to the container using corresponding hooks. Exhibit D at ¶¶ 104-106; *see also*

Exhibit B at ¶ 18. [redacted] Exhibit K at Ex. C-3; *see* Exhibit I at 142:15-143:10.

**viii.** Claim 2: It is undisputed that the *RSI-Palfinger Equipment* discloses that the calibration vehicle has sleeves that engage with arms of a calibration vehicle retainer, wherein the calibration vehicle retainer is attached to the first trailer. Exhibit D at ¶¶ 107-108; [redacted] *see also* Exhibit B at ¶ 12.

**ix.** Claim 3: It is undisputed that the spreader bar of the *RSI-Palfinger Equipment* has four hooks capable of grasping four weights simultaneously. Exhibit D at ¶ 109; [redacted]; *see also* Exhibit B at ¶ 20.

**x.** Claim 4: It is undisputed that the *RSI-Palfinger Equipment* discloses wherein the spreader bar includes a first extension bar (or coupling bar) capable of locking into a receiver in the first wall and a second extension bar (or coupling bar) capable of locking into a receiver in the second wall. Exhibit D at ¶¶ 110-111; [redacted] *see also* Exhibit B at ¶¶ 12, 20.

**xi.** Claim 5: It is undisputed that_the *RSI-Palfinger Equipment* discloses wherein the calibration vehicle, the first weights, and the second weights each have certified weight values permitting weight combinations varying from eight thousand pounds to eighty thousand pounds. Exhibit D at ¶¶ 110-112-113; [redacted] *see also* Exhibit B at ¶¶ 16, 17, 31.

**xii.** Claim 7: Claim 7 recites similar elements to Claim 1 and is anticipated by the *RSI-Palfinger Equipment* for the same reasons. *See* claim elements 1.0-1.7 above. Exhibit D at ¶¶ 110-112-113; [redacted]

**xiii.** Claim 8: The *RSI-Palfinger Equipment* discloses wherein the apparatus weighs less than 72,000 pounds. Exhibit D at ¶¶128-131. [redacted]

**xiv.** Claim 9: Each weight used with the *RSI-Palfinger Equipment* has a calibrated value of 2000 pounds. Exhibit D at ¶ 132; *see also* Exhibit B at ¶17 [redacted] *See* Exhibit K at Ex. C-3.

**xv.** Claim 17: Every element of Claim 17 is present in the *RSI-Palfinger Equipment*. *See* Exhibit D at ¶¶199. [redacted] *See* Exhibit K at Ex. C-3. [redacted] Exhibit I at 208:6-11; *see also* Supplemental Declaration of Roleof deVries ("deVries Supp. Decl.") at ¶ 9, attached as Exhibit Z. The parties agreed that "reduce rotational torque" means "to reduce the tendency to rotate about one or more axes." Dkt. 102. To meet this definition, it is enough that the *RSI-Palfinger Equipment* show that the location and shape of the receivers reduces the tendency to rotate, which the receivers in the *RSI-Palfinger Equipment* do. Exhibit Z at ¶¶ 5, 19-23. Moving the vertical location of the first receiver and the second receiver as RSI suggests does not affect the tendency to rotate and therefore does not "reduce rotational torque" as claim 17 requires. *Id.* at ¶¶ 10-18. [redacted] Exhibit G at 163:14-167:4 & Ex. 30; Exhibit H at 224:21-231:11 & Ex. 40.

3. **Claims 10-16 are Anticipated by the *RSI-Palfinger Equipment* Alone**

The *RSI-Palfinger Equipment* includes every element expressly or inherently, and therefore anticipates, Claims 10-16 of the '100 Patent under the Court's constructions. *See* Exhibit D at ¶¶ 69-200; Dkt. 102.

[redacted] Exhibit D at Ex. C-3; Exhibit A at 21:19-25, 169:14-175:6, 177:14-178:1; Exhibit T at 286:19-293:3; Exhibit L at 53:11-14, 88:7-19; Exhibit I at 16:1-23, 21:19-24:22, 142:15-143:10. [redacted] *See also* Exhibit I at 16:1-23, 21:19-24:22, 142:15-143:10. [redacted] Exhibit L at 89:2-23. Design drawings and witness testimony confirm that the spreader bar of the *RSI-Palfinger Equipment* was capable of locking in a retracted position. Exhibit C at 94:21-97:8 & Ex. 6 (Palfinger Sub 118); 97:9-100 & Ex. 6 (Palfinger Sub 110); *see also* Exhibit G at 91:12-92:1; Exhibit B at ¶¶ 20-22. At the very least, it would be a "natural result flowing from," and therefore inherent, that a spreader bar having coupling/extension bars both capable of and intended to lock in extended and retracted positions, to perform a step of "locking a [first/second] inside the spreader bar in a retracted position" and "locking a [first/second] coupling bar of the spreader bar into an extended position outside the spreader bar, as recited in claims 11 and 15 respectively. *See Continental Can*, 948 F.2d at 1269. Palfinger representatives

testified that not locking the extension bars in an extended or a retracted position is counter to the intended purpose and use of the design and in fact it would be inadvisable for safety reasons to use the spreader bar without locking the coupling bars in an extended and a retracted position during use. Exhibit C at 91:19-93:5; Exhibit B at ¶22. [redacted] *See* Exhibit I at 125:19-126:2; 127:1-128:5, 132:2-10, 133:8-16, 147:5-24. RSI has presented no affirmative evidence that the equipment was used in any other way. There can be no genuine dispute of material fact that when the *RSI-Palfinger Equipment* was used to perform railroad scale calibration services it performed every element of Claims 10-16 as further set forth below.

**i.** Preamble of Claim 10: The *RSI-Palfinger Equipment* was used to perform a method for railroad scale calibration as required by Claims 10-16. *See* claims 1 and 7 above; Exhibit D at ¶ 134 [redacted]

**ii.** Element 10.1 of Claim 10: In operation, the *RSI-Palfinger Equipment* attaches a crane on a trailer to a spreader bar that includes a plurality of hooks. *See* claims 1.1 and 1.7 above; Exhibit D at ¶¶ 135-138; *see also* Exhibit B at ¶27.

**iii.** Element 10.2 of Claim 10: The *RSI-Palfinger Equipment* uses the crane for lifting the spreader bar and for moving the calibration vehicle off of the trailer onto the railroad track rails. Exhibit D at ¶ 139 [redacted] *see also* Exhibit B ¶ 27.

**iv.** Element 10.3 of Claim 10: In operation, the *RSI-Palfinger Equipment* disengages the spreader bar from both the first receiver and the second receiver. Exhibit D at ¶¶ 140-142; [redacted] *see also* Exhibit B at ¶ 28.

**v.** Element 10.4 of Claim 10: The *RSI-Palfinger Equipment* uses the crane for engaging the plurality of hooks with grip handles of a corresponding plurality of weights on the

trailer and for moving the plurality of weights from the trailer into the container. Exhibit D at ¶144; [redacted] *see also* Exhibit B at ¶¶ 29-30.

**vi.** Element 10.5 of Claim 10: The *RSI-Palfinger Equipment* was used to calibrate a railroad scale, it was used to determine the calibration vehicle, and the plurality of weights have a desired weight. Exhibit D at ¶¶ 145-146; [redacted] *see also* Smith Decl. ¶¶ 12-18.

**vii.** Element 10.6 of Claim 10: In operation, the *RSI-Palfinger Equipment* discloses propelling the calibration vehicle along the railroad track rails to a desired location on the railroad scale. Exhibit D at ¶¶ 147-148 [redacted] *see also* Exhibit B at ¶ 31.

**viii.** Claim 11: In operation, disengaging the spreader bar from both the first receiver and the second receiver if the *RSI-Palfinger Equipment* comprises: (i) releasing a first coupling bar of the spreader bar from the first receiver; (ii) locking the first coupling bar inside the spreader bar in a retracted position; (iii) releasing a second coupling bar of the spreader bar from the second receiver; and (iv) locking the second coupl[ing] bar inside the spreader bar in a retracted position as recited in Claim 11. Exhibit D at ¶¶ 150-171; *see also* Exhibit B at ¶ 28. Importantly, the record evidence shows that the spreader bar of the *RSI-Palfinger Equipment* was both capable of locking in both an extended and a retracted position (Exhibit D at ¶¶ 155-157 [redacted]), and used in this manner. *See* Exhibit D at ¶¶ 158-163 [redacted]; Exhibit B at ¶¶ 20, 21; Exhibit L at 89:2-23.

**ix.** Claim 12: It The *RSI-Palfinger Equipment* was used by detaching the calibration vehicle from a plurality of retaining posts on the trailer and aligning the railroad track wheels of

the calibration vehicle with the railroad track rails. *See* Exhibit D at ¶¶ 172-175; [redacted]. [redacted] Exhibit B at ¶ 27.

**x.** Claim 13: Subsequent to propelling the calibration vehicle to the desired location, the *RSI-Palfinger Equipment* was used by propelling the calibration vehicle along the railroad track rails to a second desired location near the trailer; using the crane for engaging the plurality of hooks with the grip handles of the corresponding plurality of weights in the container for moving the plurality of weights from the container to the trailer; mechanically coupling the spreader bar to the first receiver and to the second receiver; and using the crane for lifting the spreader bar and for moving the calibration vehicle off of the railroad track rails and onto the trailer. *See* Exhibit D at ¶¶ 176, 177, 179, 181, 18[redacted] Exhibit B at ¶31.

**xi.** Claim 14: The *RSI-Palfinger Equipment* was used to propel the calibration vehicle to the second desired location, the calibration vehicle of the *RSI-Palfinger Equipment* was propelled within range of the crane. *See* Exhibit D at ¶ 185; [redacted] Exhibit B ¶ 31.

**xii.** Claim 15: In operation, mechanically coupling the spreader bar to the first receiver and the second receiver of the *RSI-Palfinger Equipment* comprised the steps of locking a first coupling bar of the spreader bar into an extended position outside the spreader bar; attaching the first coupling bar to the first receiver; locking a second coupling bar of the spreader bar into an extended position outside the spreader bar; and attaching the second coupling bar to the second receiver. *See* Exhibit D at ¶¶ 187-188; [redacted] Exhibit B at ¶ 33.

**xiii.** Claim 16: In operation, moving the calibration vehicle of the *RSI-Palfinger Equipment* off the railroad track rails and onto the trailer comprises attaching the calibration

vehicle to a plurality of retaining posts on the trailer. *See* Exhibit D at ¶¶ 195-198; [redacted] Exhibit B at ¶ 34.

4. **Claims 1-5 and 7-16 are Anticipated by the *RSI-Mynatt Equipment***

For the reasons set forth above regarding the *RSI-Palfinger Equipment*, the *RSI-Mynatt Equipment* also anticipates Claims 1-5 and 7-16 of the ’100 Patent. *See* Exhibit D at ¶¶ 201-324.

[redacted] *See* Exhibit D at ¶ 51; Exhibit G at 37:1-12, 40:6-42:11. [redacted] *See* Exhibit D at ¶¶ 51-57; Exhibit I at 123:16-124:2; 125:19-126:9; 127:1-128:5; 132:2-10; 133:8-16; 141:24-143:10, 147:5-24; Exhibit G at 101:25-104:7 & Ex. 10, 105:3-9, 123:4-128:4; Exhibit H at 79:16-22, 80:8-19, 89:16-90:13 & Ex. 6, 93:7-20, 118:25-121:24 & Ex. 8.

***’100 Patent at Fig. 4***




FIG. 4

[redacted]

[redacted]

5. **Claims 6, 11, and 15 are invalid as being obvious over the *RSI-Palfinger Equipment* alone or in combination with the *RSI-Mynatt Equipment***

**i.** Claim 6: [redacted] *See KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) (explaining that "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp."); Exhibit D at ¶¶ 114-119. For instance, Mr. deVries explained that there were a finite number of possible and predictable weight-bin arrangements to store 72,000 pounds of certified weights across two weight bins in rows of four weights, one of which is the claimed 4x4 and 4x5 arrangements. *Id.* at ¶ 118-119. Accordingly, "it would have been an obvious design choice to alternatively size the first and second weight bins to essentially move one row of 4 weights from the second weight bin into the first weight bin" to result at the claimed configuration to more evenly load the trailers if so desired. *Id.* at ¶ 118.

**ii.** Claim 11**:** It would have been obvious in view of the *RSI-Palfinger Equipment* alone or in combination with the *RSI-Mynatt Equipment* that each version of RSI's spreader bar was both "capable of locking in an extended and a retracted position," as required under the Court's construction, and in fact was used to perform the steps of "locking the first/second coupling bar inside the spreader bar in a retracted position" as recited in Claim 11 [redacted]

[redacted] Exhibit D at ¶¶ 154-163, 285-297; Exhibit B at ¶¶ 20-21; Exhibit I at 123:16-124:2; 125:19-126:9; 127:1-128:5; 132:2-10; 133:8-16; 141:24-143:10, 147:5-24; Exhibit C at 94:21-97:8 & Ex. 6 (Palfinger Sub 118); 97:9-100 & Ex. 6 (Palfinger Sub 110); Exhibit G at 91:12-92:1, 105:3-9, 127:24-128:4; Exhibit H at 89:16-90:13 & Ex. 6. A POSITA would understand that the intended purpose of the two holes in each coupling bar and the locking pin is to allow the operator to lock the coupling bar in one of the two positions by inserting the locking pin into the corresponding hole; therefore, if the operator used the coupling bar and locking pin as designed, he would lock the coupling bars in a retracted position when removing the spreader bar from the calibration vehicle before subsequently using the spreader bar to move thousands of pounds of weights and then lock the coupling bars in an extended position when lifting the calibration vehicle using the spreader bar. Exhibit D at ¶¶ 164, 171, 189, 192, 287-289, 313-314, 316; Exhibit C at 91:19-93:5; Exhibit B at ¶¶ 22. Further, failing to lock the extension bar in either the extended or retracted positions is inadvisable for safety reasons. Exhibit D at ¶¶ 96, 158, 164, 171, 222, 225, 288; *see also* Exhibit C at 91:19-93:5; Exhibit U at 89:3-90:16; Exhibit B at ¶ 22. For these reasons, a POSITA would find it obvious to use the spreader bar of the *RSI-Palfinger Equipment* and *RSI-Mynatt Equipment* as intended, to lock the extension/coupling bars in an extended and a retracted position.

**iii.** Claim 15**:** It would have been obvious in view of the *RSI-Palfinger Equipment* alone or in combination with the *RSI-Mynatt Equipment* to perform each of the steps of Claim 15 for the reasons set forth above with respect to Claim 11 and the additional reason that the steps of Claim 15 must be performed in order to safely and securely connect the first receiver of the calibration vehicle and the second receiver of the calibration vehicle to ultimately lift the calibration vehicle off of the railroad track rials and onto the middle section of the trailer and vice

versa. Exhibit D at ¶¶ 189, 192; *see also* Exhibit B at 91:19-93:5; Exhibit U at 89:3-90:16; Exhibit B at ¶¶ 20-22.

### *B. The Asserted Claims Are Invalid As Anticipated And/Or Obvious Over The BRC Equipment Alone Or In Combination With The RSI-Palfinger Equipment And The RSI-Mynatt Equipment*

#### 1. The *BRC Equipment* is Prior Art under 35 U.S.C. §102

The *BRC Equipment* was also in public, commercial use before February 2019.[10] Indeed, it is undisputed that the BRC Equipment was used to calibrate railroad scales for customers at least as early as 2016. *See* Exhibit R at 132:1-136:6 & Ex. 6; Exhibit Q at ¶¶ 23-27. Therefore, *the BRC Equipment* was subject to a commercial sale and was in commercial use before the '100 Patent was filed. The *BRC Equipment* was also ready for patenting at least as early as January 2016 because it was built and commercially used at customer sites. *See* Exhibit Q at ¶ 8; Exhibit R at 132:1-136:6 & Ex. 6.

#### 2. All Elements of the Claims 1-4, 7, 8, and 10-17 are anticipated over the *BRC Equipment*

The *BRC Equipment* discloses every element of Claims 1-4, 7, 8, and 10-17. *See* Exhibit D at ¶¶ 325-456 (citing Sandifer Deposition and Sandifer Declaration.). Accordingly, for the same reasons as outlined regarding the Rail Scale prior art systems, the *BRC Equipment* likewise anticipates or renders obvious all asserted claims. [redacted]

[10] Rail Scale has admitted public use by BRC, as well as asserting that the system was identical to its prior art systems. *See* Pl.'s Original Compl. and Application for Prelim. And Permanent Inj. The Court may take judicial notice of these facts as pled by BRC in the prior lawsuit.

[redacted] *See* Exhibit K at Ex. C-3; Exhibit I at 16:1-23, 21:19-24:22. Mr. Buchhorn's opinions do not create a genuine question of material fact on the invalidity of Claims 1-4, 7, 8, and 10-17 in view of the *BRC Equipment*.

[redacted] Exhibit I at 174:2-11 [redacted] Exhibit I at 177:20-178:1 [redacted] Exhibit I at 184:14-185:14.

On the other hand, Mr. Sandifer who designed the *BRC Equipment* testified that when the *BRC Equipment*'s spreader bar was used to lift weights, it would be locked in the retracted position. Exhibit R at 19:5-13; 22:16-19. [redacted] Exhibit J at 109:22-112:24. Fourth, under the plain meaning of "weight bin," the *BRC Equipment* incorporates a weight bin. Exhibit D at ¶¶ 340-341, 344. To the extent RSI argues for a narrowing construction of "weight bin," Wingfield does not infringe the '100 Patent. [redacted] Exhibit I at 194:12-24.

### 3. **Claims 5, 6, 9 are invalid for being obvious over the *BRC Equipment***

As outlined below, claims 5, 6, and 9 are likewise obvious in view of the *BRC Equipment* as they disclose design choices that would have been obvious in view of the Rail Scale prior art systems.

**i.** Claim 5: Every element of Claim 5 is disclosed by or, alternatively, rendered obvious over, the *BRC Equipment*. The *BRC Equipment's* calibration vehicle and test weights were certified to a collective weight of 80,000 pounds. *See* Exhibit R at 79:1-80:24 & Ex. 4. The *BRC Equipment's* calibration vehicle weighs 8,200 pounds and was used to hold weights between 8,200 pounds and 80,000 pounds for railroad scale calibrations. In addition, it would have been obvious and a matter of routine design choice to a person of ordinary skill in the art to modify calibration vehicle of the *BRC Equipment* to weigh 8,000 pounds like the calibration vehicles of the *RSI-Palfinger Equipment* and *RSI-Mynatt Equipment*. Exhibit D at ¶ 365.

**ii.** Claim 6: Claim 6 of the '100 Patent is obvious over the *BRC Equipment* alone. How much each weight should weigh, how many weights are used, and how they are arranged in the first and second weight bins are matters of routine design choice to a POSITA. It would be obvious to configure the *BRC Equipment* wherein the first bin holds sixteen weights in a 4 by 4 arrangement and the second bin holds 20 weights in a 4 by 5 arrangement as this claim requires to optimize loading and unloading weights in an efficient and orderly manner. Exhibit D at ¶¶ 367-369. There may have been various reasons why a person of ordinary skill in the art would want to distribute the certified weights between the first and second weight bins in various ways, including as recited in claim 6, and such a claimed configured was an obvious and routine design choice that could be selected from a finite number of possible weight-bin arrangements. *Id.* at 369.

**iii.** Claim 9: Every element of Claim 9 of the '100 Patent is rendered obvious by the *BRC Equipment.* The *BRC Equipment* used calibrated weights of 1,000 pounds because the

spreader bar of the *BRC Equipment* included six hooks. Sandifer Dep. at 123:8-124:1. However, it would have been obvious to a person of ordinary skill in the art to use 2,000-pound weights with the *BRC Equipment*, as shown for instance with the *RSI-Palfinger Equipment* and the *RSI-Mynatt Equipment*, in order to load the cart to the desired weight quicker. *Id.* Additionally, it would have been obvious and a matter of routine convenience and design choice to use a spreader bar having four hooks for lifting weights instead of six hooks, such as that shown in the *RSI-Palfinger Equipment* or the *RSI-Mynatt Equipment*, in which case it would have been obvious to a person of ordinary skill in the art to lift 2000-pound weights instead of 1000-pound weights for more efficient loading of the weights into and out of the weight cart since the spreader bar would have fewer hooks. Exhibit D at ¶ 387.

### C. *The Wingfield Equipment Does Not Infringe Any Claim Of The '100 Patent When Wingfield Uses Straps Instead Of A Spreader Bar To Lift Its Weight Cart*

RSI bears the burden of proving infringement. *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1314 (Fed. Cir. 2011). "An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Eastman Chem. Co. v. BASF Aktiengesellschaft,* No. 2:97-CV-450, 2000 WL 1897258, at *5 (E.D. Tenn. Oct. 31, 2000) (citing *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995)). The Magistrate Court already construed the claims, so the only issue before this Court is whether every element of Claims 1-17 in the '100 Patent (the "Asserted Claims"), as construed, is found in the Wingfield Equipment. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed. Cir. 1990). If even a single claim element is missing from the Wingfield Equipment, there is no literal infringement. *See V-Formation, Inc. v. Benetton Grp. SpA,* 401 F.3d 1307, 1312 (Fed. Cir. 2005).

Further, while in narrow circumstances, a product or process may still infringe under the doctrine of equivalents infringement under the Doctrine of Equivalents may be barred by prosecution history estoppel, where a patentee is prevented from regaining claim scope relinquished during prosecution of its patent application. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 737-38 (2002); *Pharma Tech Solns. v. Lifescan, Inc.*, 942 F.3d 1372, 1380 (Fed. Cir. 2019). "Prosecution history estoppel can occur in two ways: 'either (1) by making a narrowing amendment to the claim ('amendment-based estoppel') or (2) by surrendering claim scope through argument to the patent examiner ('argument-based estoppel')." *Pharma Tech Solns.*, 942 F.3d at 1380 (quoting *Conoco, Inc.v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006)).

For instance, if during patent prosecution before the USPTO the patent claims are rejected over prior art and, in response, the patentee amends the claims by a narrowing amendment and argues its amended claims distinguish the prior art to overcome the rejection, then the patentee cannot later attempt to broaden amended claim limitation for purposes of asserting patent infringement using the Doctrine of Equivalents. That is precisely the case here, where RSI had to amend limitations in its claims directed to the spreader bar and argue patentability of the amended claims to overcome a rejection based on a spreader bar in the prior art. *See* Exhibit D at ¶¶ 27-40. Under principles of prosecution history estoppel, RSI is therefore precluded from asserting infringement of any alleged equivalents to its claimed spreader bar.

Here, as noted, RSI overcame prior art during prosecution by relying on the "spreader bar" expressly recited in the claims. Thus, Wingfield's use of nylon straps to lift its weight cart (as opposed to a spreader bar) cannot as a matter of law infringe any claim of the '100 Patent. Partial summary judgment is warranted on this issue.

1. **When the Wingfield Equipment uses a pair of straps to lift its weight cart, it does not perform every step of Claim 10**

At the vast majority of customer sites after 2021, Wingfield attached its crane to a pair of nylon straps affixed to the weight cart and then used straps to move the weight cart. *See* Exhibit W at 133:23-134:11; *see also* Exhibit U at 39:24-40:4; 41:1-10 (describing having personally witnessed Wingfield's use of the straps to lift the cart at a customer site); *see also* Doc. 130 Ex. A (Godfrey Decl.) at ¶¶ 12-13; *see* Exhibit D at ¶¶ 43-46. In other words, the Wingfield Equipment used (and uses) a pair of straps, not a spreader bar, for moving its weight cart off of the trailer and onto the railroad track rails, as required by the asserted claims.

[redacted] Exhibit I at 99:25-101:17 [redacted] RSI has no evidence disputing Wingfield's position that the Wingfield Equipment does not infringe Claim 10 when Wingfield uses a pair of nylon straps to lift its weight cart, and there can be no genuine dispute of material fact on this issue.

Moreover, the doctrine of equivalents is unavailable to RSI. As noted, during prosecution, RSI made specific narrowing amendments to Claim 10 and disclaiming statements to distinguish prior art cited by the USPTO. Exhibit D at ¶¶ 27-40. Particularly, RSI argued that the claimed spreader bar is used *both* for lifting the claimed calibration vehicle and the claimed weights. *Id.* at ¶ 30. And then RSI made several narrowing amendments consistent with this argument in each independent claim, which resulted in allowance of the '100 Patent. *Id.* at ¶ 31-37. Therefore, a POSITA would read Claim 10, in view of this clear and unmistakable arguments and narrowing amendments to distinguish prior art, as requiring the claimed spreader bar be used for lifting both

the calibration vehicle and the weights. Thus, any product or method that does not use a spreader bar to lift the calibration vehicle (such as Wingfield's) is outside the scope of the claim and non-infringing.

2. **When the Wingfield Equipment uses a pair of straps to lift its weight cart, it does not include every element of Claim 1.**

Claim 1 requires "a calibration vehicle coupled to a middle section of the first trailer and "the first wall [of the calibration vehicle] including a first receiver configured to receive a coupling bar of ***a spreader bar*** and the second wall including a second receiver configured to receive another coupling bar of the spreader bar; the spreader bar attached to and stored in the first receiver and the second receiver" and "the crane mounted to a back section of the first trailer, wherein the crane is configured to position the calibration vehicle from the middle section onto the railroad track rails…."

As noted, during patent prosecution to obtain allowance of the '100 Patent, RSI distinguished the claims over the cited prior art by arguing that the spreader bar of the '100 Patent is used both for lifting the calibration vehicle and the weights. *See* Exhibit D at ¶¶ 70-71. Further, Claim 1 recites, "the spreader bar attached to and stored in the first receiver and the second receiver," which was also added by RSI relied on by RSI to distinguish the prior art.

Thus, for the same reasons outlined above with respect to Claim 10, the Wingfield Equipment does not infringe Claim 1 of the '100 Patent because it uses a pair of straps to lift and position the calibration vehicle instead of the required spreader bar.

3. **When the Wingfield Equipment uses a pair of straps to lift its weight cart, it does not include every element of Claim 7.**

Claim 7 recites "the spreader bar including: a connector for coupling to the crane, hooks for coupling to the grip handles of the plurality of weights, a first extension bar configured to

couple into the first receiver, and a second extension bar configured to couple into the second receiver." Thus, for the same reasons as set forth above with respect to claims 1 and 10, the Wingfield Equipment utilizing the nylon straps does not infringe Claim 7 because it does not include "the spreader bar" as expressly set forth in Claim 7.

4. **When the Wingfield Equipment uses a pair of straps to lift its weight cart, it does not include every element of dependent Claims 2-6, 8, 9, and 11-17.**

Because the Wingfield Equipment that uses nylon straps to lift the weight cart does not infringe any independent Claim 1, 7, or 10 of the '100 Patent as discussed above, it also does not infringe any of the dependent Claims 2-6, 8-9, and 11-17. *See, e.g., Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) ("One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim") (quoting *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed. Cir. 1989)).

## CONCLUSION

For the reasons above, Wingfield is entitled to summary judgment of invalidity of all claims of the '100 Patent in view of RSI's own equipment or the *BRC Equipment*. Further, because RSI cannot establish infringement of any claim of the '100 Patent when Wingfield uses a pair of straps to lift its weight cart, and Wingfield is entitled also to partial summary judgment of non-infringement of the '100 Patent.

Dated: April 11, 2025

Respectfully submitted,

*/s/ Eileen H. Rumfelt*
Eileen H. Rumfelt (*admitted pro hac vice*)
eileen.rumfelt@millermartin.com
Stephen E. Kabakoff (*admitted pro hac vice*)
stephen.kabakoff@millermartin.com
Miller & Martin PLLC
1180 West Peachtree Street, NW
Regions Plaza, Suite 2100
Atlanta, Georgia 30309
Telephone: (404) 962-6100
Facsimile: (404) 962-6300

Stephen Stark, Tennessee BPR 019676
Miller & Martin PLLC
832 Georgia Avenue, Suite 1200
Chattanooga, Tennessee 37402
Telephone: (423) 756-6600
Facsimile: (423) 785-8480

*Attorneys for Defendant Wingfield Scale & Measure, LLC*